905 So.2d 251 (2005)
STATE of Florida, Appellant,
v.
William Michael YULE, Appellee.
No. 2D03-4183.
District Court of Appeal of Florida, Second District.
June 29, 2005.
*252 Charles J. Crist, Jr., Attorney General, Tallahassee, and Jonathan P. Hurley, Assistant Attorney General, Tampa, for Appellant.
James Marion Moorman, Public Defender, and Kevin Briggs, Assistant Public Defender, Bartow, for Appellee.
PER CURIAM.
The State appeals the trial court's order suppressing evidence which served as the basis for criminal charges against William Michael Yule. The evidence was obtained during the course of a warrantless probationary search of a residence shared by Yule and a probationer, Stacy Ellison. We reverse.
The pertinent facts are undisputed. The search of the residence shared by Yule and Ms. Ellison took place after Ms. Ellison's probation officer was advised by another probationera relative of Ms. Ellison who was concerned about Ms. Ellison's childrenthat "Ellison was dealing drugs out of her residence." Subsequently, two probation officers went to Ms. Ellison's residence. The probation officers were accompanied for safety by two sheriff's detectives. Upon arriving at Ms. Ellison's residence, they encountered her "in a car ... getting ready to leave." One of the probation officers "stopped" Ms. Ellison and informed her that he "needed to search her house ... [b]ecause [he] had gotten word that she was dealing drugs." Ms. Ellison agreed to the search of the residence. The probation officers, accompanied by the sheriff's detectives, then entered the residence with Ms. Ellison. The probation officers went into a bedroom of the residence with Ms. Ellison, while the detectives remained in the living room where they encountered Yule and a woman. Yule and the woman were instructed by the detectives to stay put.
One of the detectives asked Yule "if he had any weapons on him." Yule responded that "he had a knife in his pocket." Yule removed the knife from his pocket. The detective told Yule to "wait a minute" *253 and took the knife from him. The detective then asked Yule if he had any more weapons on his person. Yule said that he did not and "lifted up his shirt and turned around as to display if he had any weapons on him." When Yule lifted his shirt, the detective observed an "empty pen cartridge sticking out of the rear of his pocket." The detective further observed that the clear pen cartridge had "a white residue in it." Based on his training and experience, the detective concluded that the pen cartridge "was used to ingest methamphetamine." The detective then patted Yule down and retrieved "four other tubes and cartridges" from his pocket. Yule was arrested and read his Miranda[1] rights. Yule then told the detective that underneath the couch there was a tinfoil "boat"which the detective testified is commonly used to smoke methamphetamine. Yule further stated that he had smoked methamphetamine earlier that day with a straw and the tinfoil.
Yule moved to suppress the drug paraphernalia as well as his statements made to the detective. As grounds for suppression, Yule contended the physical evidence and his statements were obtained as the result of an illegal warrantless search and an illegal investigatory detention. In his motion, Yule acknowledged that the probation officers involved were conducting a warrantless search of the residence pursuant to a provision of Ms. Ellison's probation. Yule raised an objection concerning the presence of the sheriff's detectives during the search. He did not dispute the facts concerning the search to which the officers testified as set forth above.
In its order granting the motion to suppress, the trial court determined that although the warrantless search of the residence was a valid probationary search, the search was limited to a search for probation violations. The trial court concluded that evidence obtained in the search would be admissible in a probation revocation proceeding but not to prove a new criminal offense, citing Croteau v. State, 334 So.2d 577 (Fla.1976), and Grubbs v. State, 373 So.2d 905 (Fla.1979).
The trial court's reliance on Croteau and Grubbs to support a suppression of the evidence in regard to the criminal charges against Yule was misplaced. The Florida Supreme Court, in both Croteau and Grubbs, recognized that a probation officer has the authority to enter his or her probationer's home and to conduct a warrantless search. See Grubbs, 373 So.2d at 908 (discussing the holding in Croteau, 334 So.2d at 577). In both Grubbs, 373 So.2d at 908, and Croteau, 334 So.2d at 580, the supreme court concluded that material evidence discovered during such a probationary search is admissible in a revocation proceeding.[2] The court cautioned, however, that the authority for a probationary search does not validate an otherwise unreasonable search in regard to the prosecution of a separate criminal offense. Grubbs, 373 So.2d at 908-10; Croteau, 334 So.2d at 580; see also Soca v. State, 673 So.2d 24 (Fla.1996) (discussing Grubbs).[3] *254 Significant to the present case, both Croteau and Grubbs addressed whether evidence obtained during a probationary search could be admitted in the prosecution of a new and separate criminal offense against a probationer.[4]
The present case has nothing to do with the use of evidence against a probationer in a new criminal proceeding. Instead, this case concerns evidence obtained during the course of a probationary search which implicated someone other than the probationerevidence which implicated Yule. In considering whether the evidence obtained from Yule should be suppressed, two distinct phases of the conduct of the probation officers and the detectives must be evaluated. The first phase is the entry of the residence; the second phase is the initial detention and questioning of Yule.
We agree with the State's argument that the sheriff's detectives as well as the probation officers legally entered the residence shared by Ms. Ellison and Yule. The probation officers had the authority to enter Ms. Ellison's residence to conduct a warrantless probationary search to determine whether she was in violation of her probation under either federal or state constitutional standards. Compare United States v. Knights, 534 U.S. 112, 122, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (applying a totality of the circumstances test, the Court held that a warrantless search conducted by a law enforcement officer, supported by reasonable suspicion and authorized by a consented-to condition of probation which allowed both law enforcement and probation officers to conduct a warrantless search, was reasonable within the meaning of the Fourth Amendment of the United States Constitution and evidence seized during such a search could properly be admitted in a prosecution on new criminal charges), with Soca, 673 So.2d at 28 (explaining that in order to strike a balance between the state's need to supervise probationers and an individual's constitutional right to be free from unreasonable searches and seizures pursuant to Article I, Section 12 of the Florida Constitution, the "Grubbs rule" authorizes a probation officer to conduct a warrantless probationary search but limits the admissibility of evidence obtained during the search). Under the Fourth Amendment of the United States Constitution, as interpreted in Knights, the reasonable suspicion of the probation officers concerning criminal activities by Ms. Ellison, which stands unchallenged, provided a sufficient basis for the entry and warrantless search of the residence.[5] Under Article I, Section 12 of the Florida Constitution, as interpreted *255 in Grubbs and Soca, the authority of the probation officers to monitor and control the probationer, Ms. Ellison, provided a sufficient basis for them to enter her residence and conduct a warrantless search. Either way, the probation officers had the authority to enter and conduct a warrantless search of Ms. Ellison's home.[6]
The sheriff's detectives accompanied the probation officers during the probationary search as a safety precaution. Again, such a precautionary measure violated neither the Fourth Amendment nor Article I, Section 12 under the facts of this case. Compare United States v. Brown, 346 F.3d 808, 812 (8th Cir.2003) (holding that under balancing test set forth in Knights, additional intrusion into the probationer's privacy resulting from additional law enforcement presence did not violate Fourth Amendment even where the consented-to condition of probation authorized only probation officers to conduct warrantless searches of the probationer's home but noting that, like Knights, the search was supported by reasonable suspicion; the governmental interest in ensuring probation officer safety outweighs any marginal, additional intrusion into the probationer's privacy), with Soca, 673 So.2d at 26 n. 2 (addressing the application of Grubbs, the Florida Supreme Court noted the internal rules of the Florida Department of Corrections included the preference that probationary searches be carried out with the assistance of local law enforcement officers).[7]
Once lawfully inside the residence, the detectives encountered Yule in the living room of the residence, instructed him to stay in the living room for reasons of officer safety, and one of the detectives asked him if he had any weapons. We conclude that the interest in officer safety provided an adequate justification for Yule's initial detention and the detective's inquiry concerning weapons.
There is no dispute concerning the events that transpired once Yule was detained. Yule acknowledged that he had a knife and voluntarily lifted his shirt thereby exposing the pen cartridgewith the telltale white residueto the plain view of the detective who had asked him if he had any weapons. At that point, the detective had probable cause to arrest Yule, which further justified the patdown that produced additional evidence. The detective's subsequent recovery of the tinfoil boat was the result of Yule's voluntary incriminating statement made after the detective had advised Yule of his Miranda rights.
The probationary search of the residence was justified and the detectives properly accompanied the probation officers during the search to provide additional security. To secure the premises and ensure officer safety, the detectives properly detained and questioned Yule. At each step along the way, the probation officers and the detectives acted based on proper legal authority.
Accordingly, we reverse the trial court's suppression order and remand the case for further proceedings.
Reversed and remanded.
*256 ALTENBERND, C.J., and WHATLEY, J., Concur.
CANADY, J., Concurs with opinion.
CANADY, Judge, Specially concurring.
Although I concur in the majority's conclusion that the trial court erred in suppressing the evidence at issue in this case, I write separately because I disagree with a crucial element of the analysis employed by the majority. In particular, I disagree with the majority's conclusion that "[t]he outcome of the present case does not depend on whether the decisions of the Florida Supreme Court in Croteau, Grubbs, or Soca have been superseded by the decision of the U.S. Supreme Court in Knights." Since this issue is of central importance in the analysis of this case, I set forth at length my understanding of the proper basis for deciding this case after describing the argument presented on appeal by the parties.

I. ARGUMENT ON APPEAL
The State contends on appeal that Grubbs and Croteau have been superseded by the U.S. Supreme Court decision in Knights. The State further contends that the law enforcement officers were properly present for safety reasons during the probationary search of the residence Ellison shared with Yule and that the questioning of Yule by the officers was also justified by officer safety. According to the State, the seizure of the drug paraphernalia flowed from Yule's voluntary disclosure of the pen cartridge (with its white residue) to the plain view of the detective.
Yule argues that Knights is not controlling because the law enforcement officers had no reasonable suspicion that Yule himself was engaged in criminal activity. Yule also relies on the decision in Soca v. State, 673 So.2d 24 (Fla.1996), which reaffirmed the principle on which Grubbs was based that evidence obtained in the course of a warrantless probationary search is not admissible in the prosecution of a new criminal charge. Yule contends that his detention by the detectives in the residence was improper because it was not based on a "founded suspicion of criminal activity" on his part. According to Yule, the plain view doctrine is inapplicable here both because the law enforcement officers were not legitimately in the place where the contraband was viewed and because the contraband was observed only after the improper seizure of Yule by the detectives.

II. ANALYSIS
Contrary to the assertion of the majority opinion, the outcome of this case depends on whether the decisions of the Florida Supreme Court in Croteau, Grubbs, and Soca have been superseded by the decision of the U.S. Supreme Court in Knights. Under Article I, Section 12 of the Florida Constitution, evidence is subject to suppression under the exclusionary rule if that evidence "would be inadmissable under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution." Under this provision of Florida's constitutionknown as the conformity clauseFlorida courts "are bound to follow interpretations of the United States Supreme Court with respect to the Fourth Amendment and provide to Florida citizens no greater protection than those interpretations." Soca, 673 So.2d at 27 (citing Bernie v. State, 524 So.2d 988, 990-91 (Fla.1988)); see also State v. Lavazzoli, 434 So.2d 321 (Fla.1983) (discussing history of adoption of conformity clause). Any evidence that would be admissible under the U.S. Supreme Court's interpretation of the Fourth Amendment is thus admissible in the courts of Florida. Accordingly, the trial court's order suppressing the evidence in *257 the instant case must be reversed ifas the State arguesit is inconsistent with the decision in Knights.
In analyzing the issues presented here, I will (1) review the decisions in Croteau and Grubbs, and explain why those decisions cannot be distinguished from the instant case on the ground relied on by the majority opinion; (2) examine the decision of the U.S. Supreme Court in Griffin v. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), which upheld the use in a criminal proceeding of evidence obtained in the search of a probationer's home under a Wisconsin regulation permitting warrantless probationary searches based on reasonable grounds, and discuss the decision in Soca, which distinguished Griffin and reaffirmed the holding in Grubbs prohibiting the use in criminal prosecutions of evidence obtained in probationary searches; (3) analyze the decision of the U.S. Supreme Court in Knights; (4) discuss the impact of Knights on Florida law; and (5) address Yule's specific arguments challenging the search of the residence and his initial detention and questioning by the officers.

A. Croteau and Grubbs

The trial court was correct in concluding that Croteau and Grubbs provide support for the general proposition that evidence discovered in the course of a warrantless probationary search may not be used to prove a new criminal offense. Although the rule articulated in Croteau was applied to exclude evidence in the criminal prosecution of a probationer, that rule necessarily has consequences for nonprobationers whose Fourth Amendment rightsas defined in Croteauare violated by a warrantless probationary search.
In Croteau, the court reversed the trial court's denial in a criminal prosecution of a probationer's motion to suppress evidence obtained in the course of a warrantless probationary search of the probationer's residence. 334 So.2d at 580. The court stated that "while evidence obtained in violation of the Fourth Amendment may be admissible against the probationer at a revocation hearing, such evidence cannot constitutionally be admitted at a criminal trial." Id. at 579. Accordingly, "the exclusionary rule does not apply to probation revocation hearings ... which are administrative in nature," but it is applicable to "one facing trial for a new and discrete criminal offense." Id. at 580. The court concluded that although "a probation officer has authority to enter upon the living quarters of his probationer to observe his life-style and any material evidence thereby discovered is admissible in proceedings for revocation of probation," the authority for such probationary searches "does not validate an otherwise unreasonable search for contraband resulting in prosecution for a separate criminal offense." Id.
The holding in Croteau can only reasonably be understood as the statement of a rule based on the requirements of the Fourth Amendment: "[W]e think it constitutionally required that one facing trial for a new and discrete criminal offense, as Croteau was in the instant case, be given the full protection of the Fourth Amendment and the corollary means by which the search and seizure principle is vindicated." Id. Although not explicitly stated, the underpinning of the decision in Croteau evidently is the concept that the use of evidence obtained in a warrantless probationary search is limited by the probationary purpose of the search. Under this line of reasoning, the scope of the lawfulness of the search is circumscribed by the purpose of the search and the fruit of the search may therefore be used only in probation revocation proceedings.
In Grubbs, 373 So.2d at 907, the court addressed a certified question related to a *258 defendant's challenge to a probation condition authorizing "`any Probation Supervisor and any law enforcement officer to search, at any time, the [defendant] probationer and all vehicles and premises concerning which he has legal standing to give consent to search.'" The question concerned whether a probation condition "requiring a probationer to consent to a search at any time, by any law enforcement officer" violates the Fourth Amendment and the parallel provision found in Article I, Section 12 of the Florida Constitution. Id. at 906. In response to this issue, the court concluded that a "search condition set forth unilaterally by the judge in [a] probation order which requires a probationer to consent at any time to a warrantless search by a law enforcement officer is a violation of [A]rticle I, [S]ection 12 of the Florida Constitution, and the [F]ourth [A]mendment to the United States Constitution."[8]Id. at 910.
The court also specifically stated that it was holding that "a warrantless search of a probationer's person or residence by a probation supervisor is valid to the extent that the evidence discovered is used only in probation violation proceedings" but that "the use of seized evidence in a new criminal proceeding requires compliance with customary [F]ourth [A]mendment requirements although the opportunity to meet those requirements may be easier because the defendant is a probationer." Id. at 907. In referring to customary Fourth Amendment requirements, the Grubbs court had in mind the general requirement that searches of a dwelling be based on a warrant issued on a showing of probable cause unless a warrantless search is justified by sufficient exigent circumstances. Following the Croteau decision, Grubbs rejects the possibility that a person's status as a probationer is in itself sufficient to justify a warrantless search under the requirements of the Fourth Amendment with respect to evidence to be used in a criminal prosecution.
The Grubbs court also drew a distinction between searches of probationers conducted by probation officers and such searches conducted by law enforcement officers:
The search of a probationer's person or residence by a probation supervisor without a warrant is, in our view, a reasonable search and absolutely necessary for the proper supervision of probationers. However, granting such general authority to law enforcement officials is not permissible under the search and seizure provisions of the Florida or United States Constitutions.
Id. at 909. Of course, in the context of the full opinion this reference to the authority of probation officers addresses their authority to obtain evidence of probation violationsnot evidence that can be used in a criminal prosecution.
In its discussion of Croteau and its progeny, the majority here states that "[t]he court cautioned ... that the authority for a probationary search does not validate an otherwise unreasonable search in regard to the prosecution of a separate criminal offense." (Emphasis added.) But what the Florida Supreme Court has said about the exclusion of evidence obtained in warrantless probationary searchesarticulated first in Croteau and then repeated in Grubbs and Socaamounts to more than a cautionary observation. It amounts to a holding based on an interpretation of the Fourth Amendment. And that holding is inconsistent with the conclusion of the majority *259 here that Croteau, Grubbs, and Soca have no bearing on the question of whether the Fourth Amendment permits the use of evidence obtained in a warrantless probationary search in a criminal proceeding against a nonprobationer in whose home the warrantless probationary search was conducted. The distinction the majority draws between the use of evidence against a probationer and the use of evidence against a nonprobationer cannot be reconciled with the Fourth Amendment rationale of Croteau and its progeny.
The requirements of the Fourth Amendment exist, of course, to protect not only probationers. So the rule stated in Croteau and its progeny concerning the requirements of the Fourth Amendment cannot reasonably be understood as being limited to the protection of probationers. A nonprobationer resident of a dwellingsuch as Yulewould have as much of a legitimate expectation of privacy in the dwelling and accordingly would have as much standing to assert the Fourth Amendment right identified in Croteau as would a probationer resident. See Minnesota v. Carter, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) ("We have held that `capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.'") (quoting Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)).
The majority fails to address the obvious question: If the Fourth Amendmentas interpreted by Croteau and its progenyprotects probationers against the use in criminal prosecutions of evidence obtained in warrantless probationary searches, why does the Fourth Amendment not protect nonprobationers against the like use of such evidence? To put the question more pointedly: Why is the Fourth Amendment more protective of probationers than non-probationers? To distinguish the decisions in the Croteau line of cases from the instant case it is necessary to come to terms with why, as a matter of Fourth Amendment doctrine, evidence obtained in a warrantless probationary search must be suppressed in the criminal prosecution of a probationer but not in the prosecution of a nonprobationer. This the majority fails to do. Pointing out that Yule is not a probationer does not suffice. Without providing any explanation for doing so, the majority effectively treats what Croteau and its progeny say about the protections of the Fourth Amendment as pure dicta and thus jettisons the rationale of those decisions.[9]
The doctrine of stare decisis, of course, does not require that we treat every broad statement of principle made in a prior decision as establishing a binding rule. Courts often deliver statements of legal principle that are not material to the determination of the issues actually presented and decided. We unquestionably should avoid the tendency of latching on to each and every statement of legal principle in judicial opinions and treating them as binding holdings.[10] But the very legitimate *260 concern to avoid defining the scope of the holdings in prior decisions in an unduly expansive manner does not justify the majority's conclusion that Croteau and its progeny should be interpreted as having no bearing on the Fourth Amendment rights of nonprobationers such as Yule. We should avoid unduly restrictive readings of the holdings of prior decisions, just as we should avoid unduly expansive readings.
This point is critical to the legitimacy of judicial decision making. One commentator, in discussing how to determine the scope of judicial holdings, has observed:
Legal and judicial culture play a critical role in checking abuses of the judge's countermajoritarian power. Central to that culture is the notion that any judicial decision must be justified by the giving of reasons.... For the judiciary, giving reasons justifies the exercise of governmental authority....
Viewed from this perspective, the reasons a court gives for a decision constitute a critical part of the decision itself.... When a court discards the reasoning of a prior opinion as merely dictum, unless it suggests an alternative basis for the outcome of the precedent case, it essentially relegates the prior decision to the position of an unjustifiable, arbitrary exercise of judicial power....
....
[J]udicial accountability and legitimacy derive from judicial rationality, which in turn will be found in the rationales offered by courts to justify their decisions. To discard the rationale of an earlier decision without the kind of compelling reasons that justify any departure from precedent does more than merely reinterpret a past case. It delegitimizes that case, and in the process, delegitimizes the decision in the case before the court. In sum, a commitment to the rule of law and a proper understanding of the source of legitimate authority in our constitutional order will result in a holding/dictum distinction that turns on rationales, not just facts and outcomes.
Michael C. Dorf, Dicta and Article III, 142 U. Pa. L.Rev. 1997, 2029, 2040 (1994). See also Antonin Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L.Rev. 1175, 1180, 1185 (1989) (stating that "[o]nly by announcing rules do we hedge ourselves in" and arguing "that the establishment of broadly applicable general principles is an essential component of the judicial process").
A judicial decision-making process in which the stated rationales of prior decisions are set aside on the basis of immaterial factual distinctions is a decision-making process that will inevitably be characterized by ad hoc determinations and ipse dixit deliverances. Such a process is, of course, at odds with the stability, predictability, and rationality that are hallmarks of the rule of law. And such a process is no less at odds with the requirement of our constitutional structure that judges exercise judgment and not will. See The Federalist No. 78, at 520 (Alexander Hamilton) (The Easton Press ed., 1979) ("[The judiciary] may truly be said to have neither FORCE nor WILL but merely judgment.").
Accordingly, I conclude that we must pay attention to the rule articulated by the Florida Supreme Court in Croteau and *261 Grubbs. Once that is done, the analysis must proceed to an examination of Griffin, Soca, and Knights.

B. Griffin and Soca

Griffin considered a Fourth Amendment challenge to evidence seized in the warrantless search of a probationer's home by probation officers. The seized evidencea handgun"served as the basis of Griffin's conviction of a state-law weapons offense." 483 U.S. at 870-71, 107 S.Ct. 3164. The search of Griffin's residence was conducted by the supervisor of Griffin's probation officeraccompanied by another probation officer and three policemenafter the supervisor "received information from a detective... that there were or might be guns in Griffin's apartment." Id. at 871, 107 S.Ct. 3164.
In deciding the case, the Court focused on the existence of a Wisconsin regulation governing probationary searches and the needs of the state in administering its probation system. Id. at 875-76, 107 S.Ct. 3164. The Wisconsin regulation permitted "any probation officer to search a probationer's home without a warrant as long as his supervisor approves and as long as there are `reasonable grounds' to believe the presence of contrabandincluding any item that the probationer cannot possess under the [pertinent] probation conditions." Id. at 870-71, 107 S.Ct. 3164. The Court recognized that "[a] State's operation of a probation system ... presents `special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements" applicable to searches of dwellings. Id. at 873-74, 107 S.Ct. 3164.
The Court concluded that a warrant requirement and a probable cause requirement would be inconsistent with the legitimate needs of the State in administering its probation system. Id. at 875-76, 107 S.Ct. 3164. "A warrant requirement would interfere to an appreciable degree with the probation system" by "setting up a magistrate rather than the probation officer as the judge of how close a supervision the probationer requires." Id. at 876, 107 S.Ct. 3164. "[T]he delay inherent in obtaining a warrant would make it more difficult for probation officials to respond quickly to evidence of misconduct." Id. Similarly, the administration of probation would "be unduly disrupted by a requirement of probable cause." Id. at 878, 107 S.Ct. 3164. Given the nature of the relationship between a probationer and the supervising authority, "it is both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts" to justify a search. Id. at 879, 107 S.Ct. 3164. Instead, the supervising authority "must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances." Id. Thus it is "reasonable to permit information provided by a police officer, whether or not on the basis of firsthand knowledge, to support a probationer search." Id. at 879-80, 107 S.Ct. 3164.
In light of these considerations, the Court concluded that "[t]he search of Griffin's home satisfied the demands of the Fourth Amendment because it was carried out pursuant to a regulation that itself satisfies the Fourth Amendment's reasonableness requirement under well-established principles." Id. at 873, 107 S.Ct. 3164. The Court specifically stated that it was not addressing the State of Wisconsin's argument that "any search of a probationer's home by a probation officer is lawful when there are `reasonable grounds' *262 to believe contraband is present." Id. at 880, 107 S.Ct. 3164.
Soca, 673 So.2d at 27-28, presented the question of whether Griffin was controlling precedent where the warrantless search of a probationer's residence yielded contraband that was the basis for a criminal prosecution. The Third District had concluded that Griffin was controlling. Soca v. State, 656 So.2d 536 (Fla. 3d DCA 1995). The Florida Supreme Court disagreed. Specifically, the court concluded that "Florida's statutory scheme regulating probation supervision" was not "sufficiently analogous to the Wisconsin regulation at issue in Griffin ... so as to make the holding in Griffin controlling." 673 So.2d at 27. The critical difference between the Florida and Wisconsin probation systems was the absence from the Florida system of a provision "expressly authorizing or regulating the authority of probation officers or supervisors to conduct a probationary search when it is supported by `reasonable grounds.'" Id. at 27-28. Based on that difference, the court concluded that the facts presented by the search of Soca's dwelling were "clearly distinguishable from Griffin, and under Grubbs the evidence obtained in the probationary search of Soca's [dwelling] is not admissible against him in a new criminal proceeding." Id. at 28.

C. Knights

In Knights, the U.S. Supreme Court firmly rejected a claim that "a warrantless search of a probationer satisfies the Fourth Amendment only if it is just like the search at issue in Griffini.e., a `special needs' search conducted by a probation officer monitoring whether the probationer is complying with probation restrictions." 534 U.S. at 117, 122 S.Ct. 587. Knights shifts the starting point for the Fourth Amendment analysis from the details of the State's system for supervising probationers to the reasonableness of the particular search carried out pursuant to a probation condition.
Knights was subject to a probation orderto which he had agreedwith a condition that he submit to searches by any probation officer or law enforcement officer at any time without a warrant or reasonable cause. Id. at 114, 122 S.Ct. 587. A law enforcement officer investigating an arson who "observed a number of suspicious objects" in a vehicle that had come from Knights' apartment as well as other suspicious activities around the apartment "decided to conduct a search of Knights' apartment." Id. at 115, 122 S.Ct. 587. The officer "was aware of the search condition in Knights' probation order and thus believed that a warrant was not necessary." Id. The Supreme Court was presented the question of whether evidence obtained in the warrantless search could be used in the criminal prosecution of Knights.
Basing its holding "on ordinary Fourth Amendment analysis that considers all the circumstances of a search," the Court rejected the distinctionwhich had been adopted by both the district and circuit courts as a basis for suppressionbetween searches conducted for investigatoryi.e., law enforcementpurposes and those conducted for probationary purposes. Id. at 122, 122 S.Ct. 587. Noting that "nothing in the condition of probation suggests that it was confined to searches bearing upon probationary status and nothing more," id. at 116, 122 S.Ct. 587, the Court concluded that "the search of Knights was reasonable under our general Fourth Amendment approach of `examining the totality of the circumstances,' with the probation search condition being a salient circumstance," id. at 118, 122 S.Ct. 587 (quoting Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)). Accordingly, the *263 Court reversed the order suppressing the evidence in the criminal prosecution of Knights.
In evaluating the "reasonableness of a search," the Court looked to "`the degree to which it intrudes upon an individual's privacy'" balanced against "`the degree to which it is needed for the promotion of legitimate governmental interests.'" Id. at 118-19, 122 S.Ct. 587 (quoting Wyoming v. Houghton, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)). With respect to the factor of "an individual's privacy," the Court concluded that "[t]he probation condition ... significantly diminished Knights' reasonable expectation of privacy." Id. at 119-20, 122 S.Ct. 587. With respect to the factor of "legitimate governmental interests," the Court recognized the State's "dual concern with a probationer." Id. at 120, 122 S.Ct. 587. One concern centers on the probationer's successful completion of probation; the other concern centers on the heightened potentialcompared to the community in generalfor criminal conduct by the probationer. Id. at 120-21, 122 S.Ct. 587. The Court recognized that the state's "interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen." Id. at 121, 122 S.Ct. 587.
Balancing these considerations, the Court concluded that a "reasonable suspicion"[11] was sufficient to justify "a search of this probationer's house." Id. "When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." Id. Based on the same considerations, the Court concluded that a warrant requirement was unnecessary. Id. The Court therefore held that "the warrantless search of Knights, supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment." Id. at 122, 122 S.Ct. 587.

D. The Impact of Knights on Florida Law
Under the conformity clause of Article I, Section 12 of the Florida Constitution, Knights is controlling precedent which supersedes the holdings of Croteau, Grubbs, and Soca that evidence seized in a warrantless probationary search is inadmissible in a criminal prosecution. Unlike Griffin, Knights is not based on the special needs of a probation system operating under a regulation authorizing searches by probation officers based on reasonable grounds. Under Knights, the basis on which Soca distinguished Griffin is consequently no longer pertinent. The critical question is not whether the state has specifically established a system authorizing warrantless searches of probationers based on reasonable suspicion but whether a particular search of a probationer pursuant to a probation search condition is in fact supported by reasonable suspicion. Knights holds that warrantless searches pursuant to a search condition in a probation order are not limited to searches for probationary purposes but may also include searches for law enforcement purposes. Knights therefore also holds that evidence obtained in such warrantless searches may be used in a criminal prosecution. *264 Croteau, Grubbs, and Soca cannot be reconciled with Knights.[12]

E. Yule's Claims Regarding the Search and His Detention and Questioning
Yule acknowledges that the search of the residence he shared with Ellison was pursuant to a provision of Ellison's probation. Yule does not challenge the existence of the probation officers' reasonable suspicion that Ellison had violated her probation by selling illicit drugs from the residence. Instead, Yule challenges the search based on the argument that Knights is not controlling because the law enforcement officers had no reasonable suspicion that Yule was engaged in criminal activity. Yule also challenges the presence of the detectives during the probationary search. Yule further argues that his detention in the residence was improper because it was not justified by a "founded suspicion" concerning his conduct.
As the majority opinion recognizes, in determining whether the evidence obtained from Yule should be suppressed, two phases of the conduct of the probation officers and the detectives must be considered. The first phase is the entry of the residence to perform a warrantless probationary search; the second phase is the initial detention and questioning of Yule when the officers encountered him in the living room of the dwelling.
As to the first phaseentry of the residenceunder the standard established in Knights, the requirements of the Fourth Amendment were satisfied. The reasonable suspicion of the probation officers concerning criminal activities by Ellison stands unchallenged. That reasonable suspicion provided a sufficient basis for the entry of the residence. The absence of reasonable suspicion with respect to Yule is irrelevant to the propriety of the entry of the residence to conduct a search with respect to Ellison.
The fact that a probationer shares a residence with another does not nullify the authority of probation and law enforcement officers to conduct a properly justified warrantless search of the probationer's shared residence. A person choosing to live in the same home with another who is subject as a probationer to warrantless searches has a corresponding diminished expectation of privacy. See State v. Johnson, 748 P.2d 1069, 1073 (Utah 1987), abrogated on other grounds by State v. Doporto, 935 P.2d 484 (Utah 1997) ("A warrantless search of a parolee may result in an invasion of privacy, at least to some extent, for those living with the parolee. If the Fourth Amendment rights of nonparolees living with parolees were not reduced, a parolee could avoid all warrantless parole searches by living with a nonparolee and asserting the nonparolee's constitutional rights, and thus emasculate one significant feature of the parole system."). The nonprobationer's diminished expectation of privacy extends to those portions of the shared residence over which the probationer and nonprobationer have joint dominion. "Persons who live with probationers cannot reasonably expect privacy in areas of a residence that they share with probationers." People v. Pleasant, 123 Cal.App.4th 194, 19 Cal.Rptr.3d 796, 798 (2004). Accordingly, "a warrantless search, justified by a probation search condition, may extend to common *265 areas, shared by nonprobationers, over which the probationer has `common authority.'" People v. Smith, 95 Cal.App.4th 912, 116 Cal.Rptr.2d 694, 697 (2002) (quoting United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (holding that consent to warrantless search by person with common authority over residential premises was valid against nonconsenting person who shared that common authority)); see also State v. West, 185 Wis.2d 68, 517 N.W.2d 482, 491 (1994) (stating that a "parole search may extend to all parts of the premises to which the probationer or parolee has common authority, just as if it were a consent search").
Here, the detectives encountered Yule in the living room of the residence. The living room of a dwelling willexcept in unusual circumstancesbe an area of the dwelling over which all the residents of the dwelling share common authority. And here there is no suggestion that Yule and Ellison did not share common authority over the living room. The scope of the search with respect to the probationer thus without question extended to the portion of the residence where the detectives encountered Yule.[13]
The State correctly argued that the detectives properly accompanied the probation officers during the probationary search. Considerations of safety fully justify the presence of law enforcement officers during the course of a warrantless search by probation officers based on a reasonable suspicion of criminal activityparticularly where the suspicion relates to the sale of illicit drugs. The additional security afforded by the presence of law enforcement officers during a search by probation officers is a reasonable and prudent measure calculated to forestall violent resistance to the search. "[T]he Fourth Amendment does not require probation officers to choose between endangering themselves by searching alone and foregoing the search because they lacked the resources and expertise necessary to search alone safely." United States v. Brown, 346 F.3d 808, 812 (8th Cir.2003). "[T]he governmental interest in ensuring probation officer safety outweighs any marginal, additional intrusion into [a probationer's] privacy resulting from the [law enforcement officers'] presence." Id.; see People v. Kanos, 14 Cal.App.3d 642, 92 Cal.Rptr. 614, 617 (1971) ("Police assistance properly may be requested by parole agents for providing protection and for aiding in the apprehension and investigation of a parole violator."); see also Griffin, 483 U.S. at 871, 107 S.Ct. 3164 (referring to presence of law enforcement officers during warrantless search by probation officers for evidence of weapons offense).
As to the second phase of the officers' conductthe detention and questioning of Yulethe interest in officer safety provided an adequate justification for the detectives' actions. When a properly justified search of a residence is being conducted for evidence of criminal activities involving *266 illicit drugs, persons present in the residence may be at least briefly detained and questioned in order to protect officer safety.
In Michigan v. Summers, 452 U.S. 692, 702, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the U.S. Supreme Court recognized that "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." In such circumstances, "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." Id. at 702-03, 101 S.Ct. 2587. Although the Summers' holding that the detention of an occupant was justified dealt with the particular circumstances involved in detention of a person whose residence was subject to a warrant authorizing a search for contraband issued on the basis of a probable cause determination made by a magistrate, the Court specifically noted that its holding did not "preclude the possibility that comparable police conduct may be justified by exigent circumstances in the absence of a warrant." Id. at 702 n. 17, 101 S.Ct. 2587.
The lawful warrantless search of the residence of a probationer suspected of dealing drugs raises identical concerns regarding the potential for violence which justify the officers in exercising "unquestioned command of the situation." Id. at 703, 101 S.Ct. 2587. The issue of officer safety is thus no less compelling in the instant case than it was in Summers. Here the officers were confronted with Yule and another person in addition to Ellison when they entered the residence. In Summers, the authorities encountered the defendant as he was descending the front steps of his residence. Id. at 693, 101 S.Ct. 2587. Yule potentially posed as great a threat to the officers within the confines of the residence as the defendant in Summerswho had departed the residence posed to the searching officers there. In both Summers and the instant case, the detention did not constitute an unreasonable seizure. See also Muehler v. Mena, ___ U.S. ___, 125 S.Ct. 1465, 1469-70, 161 L.Ed.2d 299 (2005) (discussing Summers and stating that "[a]n officer's authority to detain incident to a search is categorical"); DeLeon v. State, 700 So.2d 718, 720 (Fla. 2d DCA 1997) (stating that where "police obtained consent to enter [a] residence for the purpose of searching for" a criminal fugitive, it was "reasonable and justifiable" in order "to ensure officer safety" to "temporarily detain[ ] all the occupants of the house long enough to investigate the presence of the armed felon").
Once Yule was detained, he voluntarily lifted his shirt and exposed the pen cartridge with the methamphetamine residue to the plain view of the detective who was questioning him. This gave the detective probable cause to arrest Yule. That probable cause justified the patdown that produced additional evidence.[14] The ensuing *267 recovery of the tinfoil boat resulted from Yule's voluntary incriminating statement.
The fact that the search of the residence was constitutionally justified by reasonable suspicion that Ellison was engaged in criminal activities in violation of a condition of her probationrather than by suspicion regarding Yuledoes not mean that the detectives were required to ignore the criminal conduct of Yule which came to their attention as they properly performed their duties during the search. "Once the veil of the home has been legally pierced, [there is] no need for police officers to turn a blind eye to crime." Sheik-Abdi v. McClellan, 37 F.3d 1240, 1245 (7th Cir. 1994); see also Coolidge v. New Hampshire, 403 U.S. 443, 467-68, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ("Where, once an otherwise lawful search is in progress, the police inadvertently come upon a piece of evidence, it would often be a needless inconvenience, and sometimes dangerous to the evidence or to the police themselves to require them to ignore it until they have obtained a warrant particularly describing it.").
The search of the residence was justified by the reasonable suspicion that a probationer resident there was engaged in criminal activities. The detectives properly accompanied the probation officers during the search to provide additional security. To secure the premises and protect officer safety, the detectives properly detained and questioned Yule. There was no violation of the Fourth Amendment in the conduct of the probation officers and the detectives.

III. Conclusion
Because I conclude that there was no violation of Yule's Fourth Amendment rights, I concur with the reversal of the trial court's order suppressing the evidence against Yule.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The Florida Supreme Court has held that evidence obtained through a probationary search is admissible in a probation revocation proceeding, see Grubbs, 373 So.2d at 908, and its progeny, and that evidence obtained through an unlawful search is inadmissible in a probation revocation proceeding, see State v. Scarlet, 800 So.2d 220 (Fla.2001).
[3] The State argues that under the conformity clause contained in Article I, Section 12 of the Florida Constitution, Croteau and Grubbs have been superseded, at least in part, by the U.S. Supreme Court's decision in United States v. Knights, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). Although the State may be correct, we conclude that we have no need to resolve this issue. The outcome of the present case does not depend on whether the decisions of the Florida Supreme Court in Croteau, Grubbs, or Soca have been superseded by the decision of the U.S. Supreme Court in Knights. Under all of the foregoing decisions as applied to the facts in the present case, the probation officers had the authority to enter the probationer's residence and conduct a probationary search of that residence without a warrant.
[4] The Florida Supreme Court in Grubbs was not asked to address an actual search but rather to determine the propriety of a unilateral condition in a probation order which granted broad search authority to the probation supervisor and any law enforcement officer. In Grubbs, the supreme court concluded that the condition violated Article I, Section 12 of the Florida Constitution, as well as the Fourth Amendment to the United States Constitution.
[5] We note that our record does not establish whether the condition of probation in the present case was like that in Knights, a condition which allowed both law enforcement and probation officers to conduct a warrantless search of the probationer's home. However, under Florida law a condition which permits probation supervisors to visit a probationer's home is a standard condition of probation which may be included in a probation order. § 948.03(1)(b), Fla. Stat. (2002).
[6] The State has not addressed the issue of whether Ms. Ellison's consent to the search was voluntary and whether the search was thus independently justified on that basis.
[7] In Soca, the Florida Supreme Court noted the thenapplicable internal rules of the Florida Department of Corrections set forth a procedure to be followed by probation officers in effecting a search with or without a warrant. Soca, 673 So.2d at 26 n. 2. That procedure contemplated the assistance of local law enforcement officers where possible. Id. The record before this court is silent in regard to the internal rules effective at the time of this probationary search.
[8] The court specifically refrained from addressing "the effect of the express consent of a probationer given in open court at the time he or she is placed on probation." 373 So.2d at 910.
[9] Following the logic of the majority here would also lead to the conclusion that Knights' requirement that warrantless probationary searches be justified by reasonable suspicion has no application in criminal prosecutions of nonprobationers against whom evidence has been obtained in such a search. If the rule articulated in Croteau and its progeny does not extend to protect nonprobationers, why should Knights protect nonprobationers? After all, Knightslike Croteaudealt with the suppression of evidence against a probationer not a nonprobationer.
[10] For a comprehensive discussion of issues involved in establishing the boundary between holding and dicta, see Michael Abramowicz and Maxwell Stearns, Defining Dicta, 57 Stan. L.Rev. 953 (2005). Abramowicz and Stearns offer this definition: "A holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment. If not a holding, a proposition stated in a case counts as dicta." Id. at 1065.
[11] The existence of reasonable suspicion for the search of Knights' apartment was conceded by Knights. United States v. Knights, 534 U.S. 112, 122, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001).
[12] The distinction in Grubbs between searches conducted by probation officers and searches conducted by law enforcement officers similarly is inconsistent with the holding in Knights. Under Knights, a warrantless search by a law enforcement officer pursuant to a probation condition meets the requirements of the Fourth Amendment if the search is based on reasonable suspicionat least where the probation condition authorizes warrantless searches by law enforcement officers.
[13] Even areas of a dwelling not under the common control of the probationer might be subjected to the limited intrusion involved in a protective sweep if necessary to find individuals potentially threatening the safety of the officers. See People v. Ledesma, 106 Cal.App.4th 857, 131 Cal.Rptr.2d 249 (2003) (holding that protective sweep may be executed in connection with probation search if justified by pertinent circumstances); see also Maryland v. Buie, 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (holding that to justify protective sweep of premises in which arrest is made "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene").
[14] The detective did not perform a patdown and search of Yule's person until the detective had probable cause to arrest Yule. See United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (holding that probable cause for arrest is sufficient justification for search of individual's person incident to that individual's arrest). We thus have no occasion to address whether officer safety would have justified a patdown in connection with the initial detention of Yule. Compare Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (holding that where officers were searching public tavern pursuant to warrant, patdown of patron of tavern was impermissible in the absence of a reasonable belief that patron was involved in criminal activity or was armed or dangerous), and Sosa-Leon v. State, 848 So.2d 342, 343 (Fla. 2d DCA 2003) ("The mere presence of a visitor in a residence being searched pursuant to a legal search warrant is insufficient to connect him with criminal conduct justifying a search of his person."), with State v. Alamont, 577 A.2d 665 (R.I.1990) (holding that due to inherent dangerousness of circumstances where officersacting pursuant to search warrantwere searching private residence for illegal drugs officer safety justified patdown search for weapons of any occupants present while the search was in progress).